UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF MICHIGAN

| | |
|---|---|
| **MICHAEL SMITH**, individually and on behalf of other similarly situated individuals,<br><br>Plaintiff,<br><br>v.<br><br>**FORD MOTOR COMPANY**,<br><br>Defendant. | Case No.<br><br>Hon. |

**CLASS ACTION COMPLAINT FOR DAMAGES AND
INJUNCTIVE RELIEF AND DEMAND FOR JURY TRIAL**

Michael Smith, a Texas resident ("Plaintiff" or "Mr. Smith"), individually and on behalf of other similarly situated individuals, alleges the following against Defendant Ford Motor Company ("Ford" or "Defendant") upon personal knowledge as to himself and his own acts and upon information and belief – based upon, *inter alia*, the investigation made by his attorneys – as to all other matters, as follows:

**INTRODUCTION**

1.  This case is about cars trucks that do not provide the fuel economy promised by the manufacturer. Specifically, Defendant Ford Motor Company has consistently failed to accurately represent fuel economy ratings, for a number of recent models, including, but not limited to, the 2019 Ford Ranger (the "Affected Vehicles").

1

2. Because fuel economy is material to the vehicle purchase decision, legally mandated to be determined in a standardized way, and because all of Defendant's affected vehicles suffer from a common flaw, Plaintiff, the purchaser of an affected Ford Ranger, brings this matter on behalf of two classes of similarly situated individuals.

## JURISDICTION AND VENUE

3. This Court has personal jurisdiction over the parties in this case. Defendant is headquartered in Michigan, and Defendant purposefully avails itself of the Michigan market and does business in Michigan.

4. This Court has original subject-matter jurisdiction over this proposed class action pursuant to 28 U.S.C. § 1332(d), which, under the provisions of the Class Action Fairness Act ("CAFA"), explicitly provides for the original jurisdiction of the federal courts in any class action in which the proposed plaintiff class is comprised of at least 100 members, any member of the plaintiff class is a citizen of a State different from any defendant, and the matter in controversy exceeds the sum of $5,000,000.00, exclusive of interest and costs. Plaintiff alleges that the total claims of individual members of the proposed Classes (as defined herein) are well in excess of $5,000,000.00 in the aggregate, exclusive of interest and costs.

5. Venue is proper in this District under 28 U.S.C. § 1391(a). Defendant is headquartered in this district, and substantial acts in furtherance of the alleged improper conduct occurred within this District.

## PARTIES

6. Plaintiff Michael Smith is an individual and purchaser of a 2019 Ford Ranger who resides in Blanco, Texas.

7. Defendant Ford is a corporation with its principal place of business in Dearborn Michigan.

## FACTS REGARDING PLAINTIFF

8. On May 21, 2019, Plaintiff purchased a new 2019 Ford Ranger from Ford at Boerne, a dealership in Boerne, Texas.

9. Before making the decision to purchase his vehicle, Plaintiff examined the window sticker containing Ford's representations about the Ranger's fuel economy.

10. Ford's representations regarding fuel economy were an important part of Plaintiff's decision to purchase. Had Ford disclosed the true fuel economy rating of the vehicle, he would not have purchased the vehicle or he would have paid less for it.

11. Since purchasing the Ranger, Plaintiff has noticed that he has not achieved the promised 26 miles per gallon on the highway. He has tried adjusting

3

his driving style in an attempt to achieve this mileage, but has been unable to. He is unhappy with the performance of his new vehicle in this regard.

## FACTS REGARDING FORD'S FUEL ECONOMY DECEPTION

12. On February 21, 2019, Defendant issued a statement making clear that it was investigating concerns "regarding the analytical modeling that is part of our U.S. fuel economy and emissions compliance process."

13. From this investigation, Ford learned that it had adopted flawed assumptions regarding its use of road-load specifications, which are used to simulate how aerodynamic drag and tire friction affect fuel economy in the real world.

14. Because of this defect, it is likely that many Ford models have been sold and are being sold with substantially overstated fuel economy ratings, including Plaintiff's vehicle.

15. While it is unclear how many models are affected by this defect, Ford stated that it would begin its investigation with the 2019 Ranger – the precise model purchased by Plaintiff – and then assess additional vehicles.

16. Additionally, Ford has revealed that the U.S. Department of Justice opened a criminal investigation over its flawed emissions-certification processes, focusing on the same road-load estimations and coast-down procedures at issue in the paragraphs above.

17. As background, the EPA assures consumers that the fuel economy estimates on the vehicle's window stickers and as further represented by auto manufacturers are based on standardized laboratory test procedures. That means consumers can compare ratings for different vehicles to determine which vehicle is more fuel efficient. The EPA's fuel economy tests were rigorously developed and refined over a number of years to be correlated with national average values for a variety of real-world driving conditions

18. The EPA has established very specific protocols to test the fuel economy of tests vehicles in controlled laboratory conditions. Vehicles are to be driven on a dynamometer (a device similar to a treadmill) using five standardized driving patterns, which represent a variety of driving conditions. The test results from the five driving cycles are combined to yield city and highway fuel ratings.

19. Manufacturers like Defendant are required to apply the EPA's testing procedures and protocols precisely when testing and rating their own vehicles. It is the results of the manufacture's test that determine the fuel efficiency ratings that are ultimately presented to consumers on vehicle window stickers and elsewhere.

20. One component of the EPA's mandatory procedures is the use of, "road-load," a variable used to adjust the lab results to simulate the effects of driving in the real world, from wind resistance and road friction. The EPA allows

manufactures to use a procedure known as a "coastdown" to determine the proper road-load.

21.   Unbeknownst to the public, in September 2018, several Ford employees internally reported a flaw in the analytical modeling Ford uses to calculate fuel economy ratings and emissions compliance of its vehicles, specifically related to road-load and coastdown. Four months later, on February 21, 2019, Ford announced publicly that it had adopted a flawed approach to using road-load specifications to simulate how aerodynamic drag and tire friction can affect fuel economy and notified the EPA.

22.   Approximately eight weeks later, in a quarterly public filing with the Securities Exchange Commission, Ford revealed that the U.S. Department of Justice had opened a criminal investigation over its flawed emissions-certification processes. The probe, as described by Ford, currently focuses on the company's road-load estimations, including analytical and coastdown procedures used to determine published fuel-efficiency figures.

23.   Ford's flawed testing procedure resulted in Plaintiff and the Class purchasing Affected Vehicles with significantly overstated fuel economy ratings.

## CLASS ALLEGATIONS

24. Plaintiff brings this action pursuant to Rule 23 of the Federal Rules of Civil Procedure on behalf of himself and all other similarly situated individuals within the United States (the "Nationwide Class"), defined as follows:

> All individuals or entities who purchased an Affected Vehicle in the United States.

25. Additionally, Plaintiff brings this action pursuant to Rule 23 of the Federal Rules of Civil Procedure on behalf of himself and all other similarly situated Texas Citizens (the "Texas Class"), defined as follows:

> All individuals or entities who purchased an Affected Vehicle in the State of Texas.

26. At this time, Plaintiff does not know the exact number of members of the Classes; however, based on publicly available information Plaintiff believes that the number of members of each of the Classes is so numerous that joinder of all members is impractical.

27. There is a well-defined community of interest in the questions of law and fact involved in this case. Questions of law and fact common to the members of the Nationwide Class and the Texas Class that predominate over questions that may affect individual Class members include:

> (a) Whether Ford mispresented the fuel economy ratings of the Affected Vehicles;

7

(b) Whether Ford knew or should have known that its computer modeling, testing procedures and protocols for determining EPA fuel-economy figures were inaccurate;

(c) Whether knowledge of accurate EPA fuel-economy figures would be important to a reasonable person,

(d) Whether Ford failed to disclose and concealed from potential customers the fact that it inaccurately evaluated EPA fuel-economy figures;

(e) Whether Ford breached its warranty obligations; and

(f) Whether Ford engaged in unfair or deceptive acts or practices.

28. Plaintiff's claims are typical of those of all of the Classes, because Plaintiff, like all members of the Classes, purchased an Affected Vehicle, after Defendant made misrepresentations regarding its fuel economy.

29. Plaintiff will fairly and adequately protect the interests of the Classes, and has retained counsel that is experienced in litigating complex consumer class actions. Plaintiff has no interests which conflict with those of the Classes.

30. A class action is superior to other available methods for the fair and efficient adjudication of this controversy.

31. No member of the Classes has a substantial interest in individually controlling the prosecution of a separate action. The damages for each individual member of the Classes likely will be relatively small, especially given the burden and expense of individual prosecution of the complex litigation necessitated by

Defendant's conduct. Thus, it would be virtually impossible for them individually to effectively redress the wrongs done to them.

32. The prerequisites to maintaining a class action for injunctive or equitable relief are met as Defendant has acted or refused to act on grounds generally applicable to the members of the Classes, thereby making appropriate final injunctive or equitable relief with respect to the Classes as a whole.

33. The prosecution of separate actions by members of the Classes would create a risk of establishing inconsistent rulings and/or incompatible standards of conduct for Defendant. For example, one court might enjoin Defendant from performing the challenged acts, whereas another might not. Additionally, individual actions could be dispositive of the interests of the members of the Classes even where certain members of the Classes are not parties to such actions.

34. Defendant's conduct is generally applicable to the Classes as a whole and Plaintiff seeks, *inter alia*, equitable remedies with respect to the Classes. As such, Defendant's systematic policies and practices make declaratory relief with respect to the Classes as a whole appropriate.

## CAUSES OF ACTION
## COUNT I
### Violations of the Magnuson-Moss Warranty Act
### (On Behalf of the Nationwide Class)

35. Plaintiff is a "consumer" within the meaning of the Magnuson-Moss Warranty Act, 15 U.S.C. § 2301(3).

36. Ford is a "supplier" and "warrantor" within the meaning of the Magnuson-Moss Warranty Act, 15 U.S.C. § 2301(4)-(5).

37. The Affected Vehicles are "consumer products" within the meaning of the 15 U.S.C. § 2301(1).

38. 15 U.S.C. § 2310(d)(1) provides a cause of action for any consumer who is damaged by the failure of a warrantor to comply with a written or implied warranty.

39. In selling the Affected Vehicles, Defendant expressly warranted in advertisements and other representations that the Affected Vehicles had achieved certain fuel economy

40. These express warranties are written warranties within the meaning of the Magnuson-Moss Warranty Act, 15 U.S.C. § 2301(6).

41. Ford breached these warranties as described in more detail above.

42. Without limitation, the Affected Vehicles experience less fuel efficiency than represented by Ford.

43. As a direct and proximate result of Ford's breaches of its warranties, Plaintiff and the members of the Nationwide Class have been damages.

44. Plaintiff, individually and on behalf of the Nationwide Class, seeks all damages permitted by law, including diminution in the value of their vehicles, in an amount to be proven at trial.

## COUNT II
### Violations of the Texas Deceptive Trade Practices And Consumer Protection Act
**(On Behalf of the Texas Class)**

45. Plaintiff and the Texas Class members are individuals with assets of less than $25 million (or are controlled by corporations or entities with less than $25 million in assets). See Tex. Bus. & Com. Code § 17.41.

46. The Texas Deceptive Trade Practices-Consumer Protection Act ("Texas DTPA") provides a private right of action to a consumer where the consumer suffers economic damage as the result of either (i) the use of false, misleading, or deceptive act or practice specifically enumerated in Tex. Bus. & Com. Code § 17.46(b); or (ii) "an unconscionable action or course of action by any person." Tex. Bus. & Com. Code § 17.50(a)(2) & (3). The Texas DTPA declares several specific actions to be unlawful, including: "(5) Representing that goods or services have sponsorship, approval, characteristics, ingredients, uses, benefits, or qualities that they do not have"; "(7) Representing that goods or services are of a particular standard, quality, or grade, or that goods are of a particular style or model,

11

if they are of another"; and "(9) advertising goods or services with intent not to sell them as advertised." An "unconscionable action or course of action" means "an act or practice which, to a consumer's detriment, takes advantage of the lack of knowledge, ability, experience, or capacity of the consumer to a grossly unfair degree." Tex. Bus. & Com. Code § 17.45(5). As detailed herein, Ford has engaged in an unconscionable action or course of action and thereby caused economic damages to the Texas Class.

47. In the course of business, Ford willfully failed to disclose and actively concealed the conduct discussed herein and otherwise engaged in activities with a tendency or capacity to deceive. Ford also engaged in unlawful trade practices by employing deception, deceptive acts or practices, fraud, misrepresentations, or concealment, suppression, the use of a mileage cheat device, and/or omission of any material fact with intent that others rely upon such concealment, suppression, or omission, in connection with the sale of the Affected Vehicles.

48. Ford's unfair or deceptive acts or practices were likely to and did in fact deceive reasonable consumers, including Plaintiff and the other Texas Class members, about the true performance of the Affected Vehicles, the lower fuel economy, the shorter range of the vehicle due to its lower fuel economy, and the increased environmental impact of Ford vehicles, and the true value of the Affected Vehicles.

12

49. Ford intentionally and knowingly misrepresented material facts regarding the Affected Vehicles with intent to mislead Plaintiff and the Texas Class.

50. Ford knew or should have known that its conduct violated the Texas DTPA.

51. Ford's omissions and/or misrepresentations about the fuel consumption of the Affected Vehicles were material to Plaintiff and the Texas Class.

52. Plaintiff and the Texas Class suffered ascertainable loss caused by Ford's misrepresentations and their concealment of and failure to disclose material information. Class members who purchased the Affected Vehicles either would have paid less for their vehicles or would not have purchased them at all but for Ford's violations of the Texas DTPA.

53. Plaintiff will send a notice letter contemporaneously with service of the complaint complying with Tex. Bus. & Com. Code Ann. § 17.505 to Ford.

54. Plaintiff seeks monetary relief against Ford measured as actual damages in an amount to be determined at trial, treble damages for Ford's knowing violations of the Texas DTPA, and any other just and proper relief available under the Texas DTPA.

## COUNT III
## FRAUDULENT CONCEALMENT
### (On Behalf of the Nationwide Class)

55. Ford knew or should have known that the Affected Vehicles were and are defective because the EPA fuel-economy figures associated with each vehicle were materially inflated and mispresented.

56. Ford fraudulently concealed from and/or failed to disclose to Plaintiff and Class Members the fact that it was not employing proper testing protocols and procedures mandated by the EPA from which fuel-economy figures for its vehicles are properly derived.

57. Ford was and is under a duty to Plaintiff and the Classes to disclose these facts because: Ford is in a superior position to know the facts surrounding the testing protocols and procedures it actually used to determine fuel-economy figures and Ford actively represented fuel economy figures which were materially overstated.

58. The fuel-economy figures which were not concealed and/or disclosed by Ford to Plaintiff and the Classes are material facts that a reasonable person would have considered important in deciding whether or not to purchase (or to pay the same price for) a motor vehicle.

59. Ford intentionally, willfully, maliciously or recklessly concealed and/or failed to disclose that the fuel-economy figures were not accurate for the purpose of inducing Plaintiff and members of the Classes to purchase their vehicles.

60. Plaintiff and Class Members did not know about the inaccuracy of the fuel-economy figures and could not have known about them when they purchased the their vehicles because of Ford's active concealment.

61. Plaintiff and the Class justifiably acted or relied upon—to their detriment—the concealed and/or non-disclosed facts as evidenced by their purchases of their vehicles.

62. Had Plaintiff and members of the Classes known of the misrepresentation, they would not have purchased (or would have paid substantially less for) their vehicles.

63. As a direct and proximate result of Ford's misconduct, Plaintiff and Class Members have suffered actual damages in that they bought and own vehicles which were sold on the basis of materially inaccurate fuel-economy figures.

64. Plaintiff and Class Members have suffered losses resulting from Ford's fraudulent or reckless non-disclosure. Accordingly, Ford is liable for all damages proximately caused by its conduct in an amount to be proven at trial.

65. Ford's acts were done wantonly, maliciously, oppressively, deliberately, with intent to defraud, and in reckless disregard of Plaintiff's and Class

Members' rights and the representations that Ford made to them, in order to enrich Ford.

66.  Ford's conduct warrants an assessment of punitive damages in an amount sufficient to deter such conduct in the future in an amount to be determined according to proof.

### COUNT IV
### UNJUST ENRICHMENT
### (On Behalf of the Nationwide Class)

67.  As set forth above, Plaintiff and other Class members have suffered harm from purchasing vehicles with artificially inflated EPA fuel-economy figures.

68.  As a result of its wrongful and fraudulent acts and omissions, as set forth herein, Ford charged a higher price for its vehicles than their true value and Ford, therefore, obtained monies that rightfully belong to Plaintiff and other Class members.

69.  Ford has benefitted from manufacturing, selling, and leasing at an unjust profit defective Affected Vehicles whose value was artificially inflated by Ford's concealment of their true fuel-economy figures.

70.  Ford enjoyed the benefit of increased financial gains to the detriment of Plaintiff and other Class members, who paid a higher price for their vehicles that actually had lower values.

71. Ford has received and retained unjust benefits from the Plaintiff and other Class members, and inequity has resulted.

72. It would be inequitable and unconscionable for Ford to retain these wrongfully obtained benefits

73. Because Ford concealed its fraud and deception, Plaintiff and other Class members were not aware of the true facts concerning their vehicles and did not benefit from Ford's misconduct. Ford knowingly accepted and retained the unjust benefits of its fraudulent conduct. As a result of Ford's misconduct, the amount of its unjust enrichment should be disgorged and returned to Plaintiff and other Class members, in an amount to be proven at trial.

## COUNT V
## BREACH OF EXPRESS WARRANTY
### (On Behalf of the Nationwide Class)

74. Ford provided all purchasers of the Affected Vehicles with express warranties, including but not limited to Emissions Defect Warranties and Emissions Performance Warranties which became part of the basis of the bargain.

75. Ford breached these warranties by selling Affected Vehicles with misrepresented fuel-economy figures.

76. Plaintiff was not required to notify Ford of the breach, because affording Ford a reasonable opportunity to cure its breach of written warranty would

17

have been futile. Ford knew of the defect alleged herein and chose to conceal it and failed to comply with its warranty obligations.

77. Any attempt to disclaim or limit these express warranties vis-à-vis consumers is unconscionable and unenforceable under these circumstances. Ford's warranty limitation is unenforceable because it knowingly sold a defective product without informing consumers about the defect.

78. Plaintiff and Class Members have complied with all obligations under the warranty, or otherwise have been excused from performance of those obligations as a result of Ford's conduct described herein.

79. As a direct and proximate cause of Ford's breach, Plaintiff and the other Class Members bought Affected Vehicles they otherwise would not have, overpaid for their vehicles, did not receive the benefit of their bargain, and their Affected Vehicles suffered a diminution in value.

80. Plaintiff and Class Members have also incurred and will continue to incur damages in the form of additional fuel costs as a result of the inaccurate fuel economy representations.

81. Plaintiff and Class Members are entitled to legal and equitable relief against Ford, including damages, consequential damages, specific performance, attorneys' fees, costs of suit, and such further relief as the Court may deem proper.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff demands judgment on behalf of himself and the Classes as follows:

A. An order certifying the proposed Classes; appointing Plaintiff as the representative of the Classes; and appointing Plaintiff's undersigned counsel as Class counsel for the Classes;

B. A declaration that Defendants are financially responsible for notifying members of the Classes of the pendency of this suit;

C. Monetary damages and injunctive relief for members of the Classes;

D. An order awarding Plaintiff and the other members of the Classes the reasonable costs and expenses of suit, including their attorneys' fees; and

E. Any further relief that the Court may deem appropriate.

## JURY TRIAL DEMANDED

Plaintiff demands a trial by jury for all claims so triable.

Dated:  July 3, 2019                    Respectfully submitted,

*/s/ E. Powell Miller*
E. Powell Miller (P39487)
Sharon S. Almonrode (P33938)
William Kalas (P82113)
**THE MILLER LAW FIRM, P.C.**
950 W. University Drive, Suite 300

Tel: (248) 841-2200
Fax: (248) 652-2852
epm@millerlawpc.com
ssa@millerlawpc.com
wk@millerlawpc.com

**BERGER MONTAGUE PC**
E. Michelle Drake*
Joseph C. Hashmall*
43 SE Main Street, Suite 505
Minneapolis, MN 55414
Tel: (612) 594-5999
Fax: (612) 584-4470
emdrake@bm.net
jhashmall@bm.net

**admission* forthcoming

*Counsel for Plaintiff*

20